# Table of Contents

## Exhibits

**Exhibit A** ............................................................................................................ **11**

**Exhibit B** ............................................................................................................ **56**

**Exhibit C** ............................................................................................................ **74**

**Exhibit D** ............................................................................................................ **83**

**Exhibit E** ............................................................................................................ **101**

**Exhibit F** ............................................................................................................ **120**

**Exhibit G** ............................................................................................................ **130**

**Exhibit H** ............................................................................................................ **143**

**Exhibit I** ............................................................................................................ **156**

**Exhibit J** ............................................................................................................ **170**

**Exhibit K** ............................................................................................................ **179**

**Exhibit L** ............................................................................................................ **185**

**Exhibit M** ............................................................................................................ **197**

**Exhibit N** ............................................................................................................ **208**

# EXHIBIT A

# LOAN AGREEMENT

between

## SAM PARABIA AND PERIN PARABIA,
as Borrower

to

## THE NATIONAL REPUBLIC BANK OF CHICAGO,
as Lender

| | |
|---|---|
| Dated | As of January 5, 2009 |
| Property Address: | 7213 Romero Drive |
| | La Jolla, California |
| County: | San Diego |
| State | California |
| W&R File No.. | 9400/1054 |
| Loan No : | 6384000 |

{F \w pdoc\9400\1054 00/00129657 DOC }

EXHIBIT A
12

## LOAN TERMS

| | |
|---|---|
| Note Date | As of January 5, 2009 |
| Borrower: | **SAM PARABIA AND PERIN PARABIA,** |
| Borrower Address· | 7213 Romero Drive, La Jolla, California 92037 |
| Original Principal Amount: | $1,000,000.00 |
| Applicable Interest Rate: | Eight and Zero Tenths Percent (8.0%) |
| Monthly Payment Amount: | interest only |
| Maturity Date: | January 5, 2010 |
| Initial Payment Date | 5th of February, 2009 |
| Scheduled Payment Date: | 5th day of each calendar month |
| Prepayment Consideration· | Ten Percent (10 0%) of the Outstanding Principal Balance |

### FINANCIAL REPORTING

| **Due** | **Reporting** |
|---|---|
| Annual | Personal Financial Statements |
| | Tax Returns – Borrower |

{F \wpdocs\9400\1054 00/00129657 DOC,}

## TABLE OF CONTENTS

Article 1.     DEFINITIONS............................................. ...... .... .. . .. ............. .... . . . . ... 1
   Section 1.1     Definitions. . ................................................. ... .. .. .............. . ... . . 1

Article 2.     LOAN TERMS ....................................... ... ... . ..................................... .. . 8
   Section 2.1     Agreement to Borrow and Lend ................................ .... ... ...... ..... 8
   Section 2.2     Payments, Maturity .. ... . .......... .... .. ......................... ..... .. 8
   Section 2.3     Interest Rate ............................................... .. .. .. ......................... 8
   Section 2.4     Security    .. . .. ...... ..... ...... .. ........................ ... . . .. ... 9
   Section 2 5     Usury Laws  ...  ... . ........ ...... ............ ............... ...... . . ... . . ... 9

Article 3     REPRESENTATIONS AND WARRANTIES OF BORROWER.............. . . 9
   Section 3.1     Legal Status and Authority .. ........................................ .. . . 9
   Section 3 2     Status of Borrower ... ....................................... .. . . . ............... 10
   Section 3 3     Validity of Documents .............................. .. .. .. . ................... 10
   Section 3.4     Litigation ................... .. .. ........ .  . .. . ............ . 10
   Section 3.5     Status of Property...... .   ...... .. .. . .................... . 10
   Section 3.6     Separate Tax Lot  ..  ..... .. .. . ....... .. .  . ..... 11
   Section 3 7     No Foreign Person ............................................ ... . .. . ...... ..... 11
   Section 3.8     Leases........... .........................  .. ..... ... ... .....  11
   Section 3.9     Financial Condition .. ......... ... . .          . . .. . ..... ....... . 12
   Section 3.10     Business Purposes .  .. .. . ..   .. . .. ....... . 12
   Section 3 11     Taxes  ......... ..................................... .. 12
   Section 3.12     No Change in Facts or Circumstances ....... ...... .. . 12
   Section 3.13     Disclosure ......... .. ............................ .  . . . 12
   Section 3.14     Third Party Representations ... ...  ...   . ... .......  . ....... ......... 13

Article 4.     INSURANCE, CASUALTY, CONDEMNATION AND PROCEEDS. .... . .. 13
   Section 4.1     Insurance.......................................... .. . . . ..... ... . 13
   Section 4.2     Condemnation ............................... .... . .  . .. 16
   Section 4 3     Restoration .. ...................................... .. . . ... 17

Article 5.     BORROWER COVENANTS .. ........   .  . ..  .. .  . ....... .. ... 19
   Section 5.1     Property Use....... . .......   .. .  .. ..  . .. 19
   Section 5.2     Payment of Taxes, etc .. ...  .. . .. ..  ..    .  . 19
   Section 5 3     Leases and Rents.......... ..................................  . . 20
   Section 5 4     Maintenance of Property ...... ... .  . . ................... ..... 21
   Section 5.5     Compliance With Laws ......... .. . . .  .  .21
   Section 5.6     Books and Records ............................................ ...... . .. .  . 22
   Section 5 7     Mechanics' and Other Liens ...... ......... .. ............  . 22
   Section 5.8     Management of the Property.......................................  . ... . 23
   Section 5 9     Performance of Other Agreements     .. ... ...... . . ....... . 23
   Section 5.10     Access to Property    .. .    .   . . .  .. . .23
   Section 5.11     Litigation. ... ...   . ...... ... . ..................  .. . . 23
   Section 5.12     Alterations. ... . . . ...................... .. .. . ...... 23

1

EXHIBIT A
14

Section 5.13      Banking Relationship............................................................... 24
Section 5.14      Compliance With Lender. ....................................................... 24

Article 6.        ENTITY COVENANTS ............................................................ 24
Section 6.1       Single Purpose Entity/Separateness ........................................ 24
Section 6.2       Change of Name, Identity or Structure. ................................. 26
Section 6.3       Business and Operations. ........................................................ 26

Article 7.        TRANSFERS............................................................................. 26
Section 7.1       Transfers by Borrower ............................................................ 26
Section 7.2       Permitted Transfers. ................................................................ 27

Article 8.        RESERVE FUNDS.................................................................... 27
Section 8.1       Tax Reserve Fund .................................................................... 27
Section 8.2       Insurance Premium Reserve .................................................... 27
Section 8.3       Replacements ........................................................................... 27
Section 8.4       Reserve Funds Generally ........................................................ 27

Article 9.        DEFAULTS; REMEDIES ......................................................... 28
Section 9.1       Defaults.................................................................................... 28
Section 9.2       Remedies................................................................................... 29
Section 9.3       Right to Cure Defaults ............................................................ 30
Section 9.4       Additional Administrative Fee. ............................................... 30

Article 10.       ENVIRONMENTAL MATTERS ............................................. 30
Section 10.1      Environmental Representations and Warranties....................... 30
Section 10.2      Environmental Covenants......................................................... 31
Section 10.3      Lender's Rights ........................................................................ 32
Section 10.4      Release ...................................................................................... 32
Section 10.5      Environmental Indemnification ............................................... 32

Article 11.       INDEMNITY............................................................................. 33
Section 11.1      Indemnity.................................................................................. 33

Article 12.       WAIVERS ................................................................................. 34
Section 12.1      Marshalling and Other Matters ................................................ 34
Section 12.2      Waiver of Notice ...................................................................... 34
Section 12.3      Waiver of Statute of Limitations............................................. 34
Section 12.4      Modification, Waiver in Writing. ............................................ 34
Section 12.5      Delay Not a Waiver ................................................................. 34
Section 12.6      Waiver of Trial by Jury............................................................ 34
Section 12.7      Waiver of Counterclaim .......................................................... 35

Article 13.       GENERAL PROVISIONS ........................................................ 35
Section 13.1      Notices ...................................................................................... 35
Section 13.2      Expenses ................................................................................... 36
Section 13.3      Appraisal................................................................................... 36
Section 13.4      Entire Agreement, Amendments and Waivers ........................ 36

ii

EXHIBIT A
15

Section 13.5     Further Assurances............ .......... ............ ......... ........ ..................... .......... 36
Section 13.6     No Third Party Benefits....... . . ....... .. ...... .. .... ` ...... ............. ..... .. 37
Section 13.7     Assigns..................... . ........ ............ ....... ......... ....... ......... ...... 37
Section 13.8     Counterparts......... ......... ....................... ........ .................. ........ ..... 37
Section 13 9     Governing Law .. ........ .. ........ . . ....... ...... ........ .................. ... . .. 37
Section 13.10    Time of the Essence ... ........ ........ .......... .. ..... ....... ... . . ...... . 37
Section 13 11    Severability ....... . .. ...... ........ .. ...... ... ........ ........ ...... ...... . 37
Section 13.12    JURISDICTION AND VENUE   ............ ...... . ...... ................... . .... 37
Section 13.13    Acknowledgments.... ............ ......... ......... ......... . ...... ...... ....... 38
Section 13.14    Conflicts ......... . ...... . .. ......... . ...... . . ..... . . ...... ......... . ...... .. 38

EXHIBIT A
16

This Loan Agreement (the "Agreement") is made as of this 5th day of January, 2009, by and among **SAM PARABIA AND PERIN PARABIA**, individuals, having an address at 7213 Romero Drive, La Jolla, California 92037 ("Borrower"), and **THE NATIONAL REPUBLIC BANK OF CHICAGO**, a national bank, having an address at 1201 West Harrison Street, Chicago, Illinois 60607 ("Lender").

## RECITALS

**WHEREAS**, Borrower is financing the real estate commonly known as 7213 Romero Drive, La Jolla, California;

**WHEREAS**, Lender has agreed to make a loan to Borrower in the original principal amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000 00). The Loan is to be evidenced by a promissory note of even date herewith in the original principal amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (the "Note"), and secured by, among others, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Borrower to Lender encumbering the Property (as defined below), and such other documents, instruments and agreements as may now or hereafter be executed, Borrower and/or others in favor of Lender which wholly or partially secure or guaranty payment of the Note, all dated as of the date hereof (the "Other Security Documents") (this Agreement, the Note, the Security Instrument, the Guaranty and the Other Security Documents are collectively referred to as the "Loan Documents");

**WHEREAS**, subject to the terms and conditions of this Agreement, Lender has agreed to make the Loan,

**NOW THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, the sufficiency of which of hereby acknowledged, the parties hereto represent and agree as follows·

## Article 1. - DEFINITIONS

Section 1 1  **DEFINITIONS**

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent·

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person

"Alteration Threshold" shall mean $50,000 00

"Applicable Laws" shall mean all existing and future federal, state and local laws, ordinances, governmental rules and regulations or court orders affecting or which may be interpreted to affect the Property, the use of the Property or the Borrower

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which the Note is payable (excluding Saturdays and Sundays).

"Casualty" shall mean damage or destruction by fire, earthquake, wind or other casualty.

"Closing Date" shall mean the date of the funding of the Loan.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage or any other Loan Document.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Default Rate" shall have the meaning set forth in the Note.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time

"Environmental Law" shall mean (a) any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of Remediation or prevention of Releases of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment, (b) including, but not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues:  the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including, without limitation, Subtitle I relating to underground storage tanks), the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act, the Federal Water Pollution Control Act, the Federal Insecticide, Fungicide and Rodenticide Act;

2

the Endangered Species Act; the National Environmental Policy Act; the River and Harbors Appropriation Act and the Residential Lead-Based Paint Hazard Reduction Act; and (c) including, but not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law conditioning transfer of property upon a negative declaration or other approval of a governmental authority of the environmental condition of the property; requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any governmental authority or other Person, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity, relating to nuisance, trespass or other causes of action related to the Property; and relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property.

"Environmental Liens" shall mean any lien or encumbrance imposed pursuant to any Environmental Law, whether due to the act of Borrower or any other Person

"Environmental Report" shall have the meaning set forth in Section 10 1 hereof.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor statutes thereto and applicable regulations issued pursuant thereto in temporary or final form.

"Event of Default" shall have the meaning set forth in Section 9 hereof.

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean and included N/A.

"Hazardous Substances" shall mean any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including, without limitation, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, materials containing lead based paint, radon, radioactive materials, flammables and explosives

"Improvements" shall mean the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and Improvements now or hereafter erected or located on the Land

3

{F \wpdoes\9400\1054 00/00129657 DOC.}

"Indemnified Persons" shall mean (a) Lender, (b) any prior owner or holder of the Loan, (c) any receiver or other fiduciary appointed in a foreclosure or other bankruptcy, insolvency, reorganization, conservatorship or other relief with respect to debts, proceeding, (d) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (e) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Person's assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Security Instrument.

"Insurance Premiums" shall mean the premiums due under the insurance policies required by this Agreement.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Land" shall mean the real property described in Exhibit A attached to the Security Instrument.

"Lease" shall mean all leases and other agreements affecting the use, enjoyment or occupancy of all or any portion of the Property or the Improvements

"Legal Requirements" shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Loan" shall mean the loan made by Lender to Borrower pursuant to this Agreement

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Environmental Indemnity, and any and all other documents, agreements

4

and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to legal fees and other costs of defense)

"Major Lease" shall mean as to the Property (i) any Lease which, individually or when aggregated with all other leases at the Property with the same Tenant or its Affiliate, demises either (A) five percent (5%) or more of the Property's net rental income, or (B) 5,000 square feet or more of the Property's gross leasable area, (ii) any Lease which contains any option, offer, right of first refusal or other similar entitlement to acquire all or any portion of the Property, or (iii) any instrument guaranteeing or providing credit support for any Lease meeting the requirements of (i) or (ii) above.

"Management Agreement" shall mean the management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, as the same be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement

"Maturity Date" shall mean January 5, 2010.

"Net Proceeds" shall mean the net amount of insurance proceeds received by the Lender as a result of a Casualty after deduction of the Lender's reasonable costs incurred in collecting the proceeds

"Note" shall mean that certain promissory note of even date herewith in the principal amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Permitted Encumbrances" shall mean collectively, (a) the Lien and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion, all of which Lender determines in the aggregate as of the date hereof do not materially adversely affect the value or use of the Property or Borrower's ability to repay the Loan

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or

municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Personal Property" shall mean all machinery, equipment (as such term is defined in Article 9 of the Uniform Commercial Code), fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land or the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land or the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land or the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land or the Improvements, and all proceeds and products of the above.

"Policies" shall mean the insurance policies with the coverages required under this Agreement.

"Property" shall mean the Land, the Improvements thereon and all Personal Property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to such property and Improvements.

"Release" of any Hazardous Substance shall mean any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances

"Remediation" shall mean (a) any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance, (b) any actions to prevent, cure or mitigate any Release of any Hazardous Substance, (c) any action to comply with any Environmental Laws or with any permits issued pursuant thereto, or (d) any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

"Rents" shall mean all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses from the Property and the Improvements whether paid or accruing before or after the filing by or against the Lessor of any petition for relief under the U S. Bankruptcy Code

"Reserve Account" shall mean the following accounts: the Tax Reserve Account or any other escrow account established by the Loan Documents.

"Reserve Fund" shall mean the Tax Reserve Fund or any other escrow funds established by the Loan Documents

"Restoration" shall mean, following the occurrence of a Casualty or a Condemnation which is of a type necessitating the repair of the Property, the completion of the repair and restoration of the Property as nearly as possible to the condition the Property was in

6

{F \wpdocs\9400\1054 00/00129657 DOC,}

immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"Restoration Consultant" shall mean an independent inspecting engineer selected by Lender to inspect, review and approve Restoration work done at the Property

"Scheduled Payment Date" shall have the meaning set forth in the Note.

"Security Instrument" shall mean that certain first priority Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time

"State" shall mean the state in which the Property or any part thereof is located

"Tax Reserve Fund" shall have the meaning set forth in Section 8 1 hereof

"Tax Reserve Account" shall have the meaning set forth in Section 8 1 hereof

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof

"Tenant" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease or other occupancy agreement with Borrower

"Title Insurance Policy" shall mean that certain ALTA mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Mortgage.

"Transfer" shall mean any direct or indirect sale, conveyance, mortgaging, grant, alienation, encumbrance, pledge, assignment or other transfer of the Property or any part thereof, or interest therein, or agreement to do any of the foregoing, whether voluntary or involuntary, and shall be deemed to include (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments, (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any rents, (iii) if Borrower or any general partner or managing member (or if no managing member, any member or non-member manager) of Borrower is a corporation, the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock such that, in any such event, an aggregate of more than forty-nine percent (49%) of such corporation's stock shall be transferred, whether in one or a series of transactions, (iv) if Borrower or any general partner or managing member (or if no managing member, any member or non-member manager) of Borrower is a limited or general partnership or joint venture, the change, removal, resignation or addition of a general partner or joint venturer or the transfer or pledge of the partnership interest of any general partner or joint venturer or any profits

{F \wpdoes\9400\1054 00/00129657 DOC,}

EXHIBIT A
23

or proceeds relating to such partnership or joint venture interest; (v) if Borrower or any general partner or managing member of Borrower is a limited liability company with a managing member, the change, removal, resignation or addition of a managing member or the transfer of the membership interest of a managing member or any profits or proceeds relating to such managing membership interest or the transfer, change, removal, resignation or addition of any member such that an aggregate of more than forty-nine percent (49%) of the membership interests in such limited liability company shall be transferred, whether in one or a series of transactions; and (vi) if Borrower or any general partner or managing member of Borrower is a limited liability company without a managing member, the change, removal, resignation or addition of any non-member manager whatsoever, or the transfer, change, removal, resignation or addition of any member such that an aggregate of more than forty-nine percent (49%) of the membership interests in such limited liability company shall be transferred, whether in one or a series of transactions.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State.

## Article 2. - LOAN TERMS

Section 2.1    **AGREEMENT TO BORROW AND LEND**    Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower an amount equal to ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) on the terms of and subject to the conditions of the Loan Documents.

Section 2.2    **PAYMENTS, MATURITY**

(a)    Payments, Generally.    Payments of principal and interest shall be due and payable by Borrower to Lender as provided in the Note.  The then outstanding principal and all accrued and unpaid interest and any other amounts due under the Loan Documents shall be due and payable on the Maturity Date, if not sooner paid.

(b)    Prepayments.    The Loan may not be prepaid, in whole or in part, except in strict accordance with the express terms of the Note.

Section 2.3    **INTEREST RATE**.

(a)    Interest Rate.    The Loan shall bear interest at a rate per annum as set forth in the Note.  Interest on the principal sum of this Note shall be calculated on a 365/360-day simple interest basis and the exact day in each month, but shall not exceed the maximum rate of interest allowable under applicable law for loans of this type.

(b)    Late Payment.    If Borrower fails to pay any installment of interest or principal within ten (10) days after the date when due, Borrower shall pay a late charge as provided in the Note.

(c)    Default Rate.    In the event that, and for so long as, any Event of Default shall have occurred, and to the extent permitted by law, all accrued and unpaid interest, the outstanding principal balance and any other amounts due under the Loan Documents shall accrue

8

{F:\wpdocs\9400\1054 00\00129657 DOC,}

interest at the Default Rate (as set forth in the Note), calculated from the date such payment was due without any grace or cure periods contained herein.

      Section 2.4    **SECURITY**. The Loan is secured by a first lien on the Property created by the Security Instrument and the Other Security Documents.

      Section 2.5    **USURY LAWS**. It is the intention of Borrower and Lender to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between Lender and Borrower, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to Lender as interest under the Loan Documents, or in any other document evidencing, securing or pertaining to the Debt, exceed the maximum permissible under applicable usury or such other laws (the       Amount"). If from any possible construction of any document, interest would otherwise be payable under any Loan Document in excess of the Maximum Amount, or in the event for any reason whatsoever any payment by or act of Borrower pursuant to the terms or requirements of any Loan Document shall result in the payment of interest which would exceed the Maximum Amount, then any such construction shall be subject to the provisions of this Section, and ipso facto such document shall be automatically reformed, without the necessity of the execution of any amendment or new document, so that the obligation of Borrower to pay interest or perform such act or requirement shall be reduced to the limit authorized under the Applicable Laws, and in no event shall Borrower be obligated to pay any interest, perform any act, or be bound by any requirement which would result in the payment of interest in excess of the Maximum Amount  Any amount received by Lender in excess of the Maximum Amount shall, without further agreement or notice between or by any party hereto, be deemed applied to reduce the principal amount of the Note immediately upon receipt of such moneys by Lender, with the same force and effect as though Borrower had specifically designated such sums to be applied to principal prepayment  The provisions of this Section shall supersede any inconsistent provision of this Agreement or any other Loan Document.

## Article 3. - REPRESENTATIONS AND WARRANTIES OF BORROWER

      To induce Lender to make the Loan and to enter into this Agreement, Borrower hereby represents and warrants to Lender·

      Section 3.1    **LEGAL STATUS AND AUTHORITY**. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the State or Commonwealth where the Property is located; (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted; (d) has full power, authority and legal right to execute the Loan Documents, and to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of the Loan Documents on Borrower's part to be performed and (e) has and shall continue to have the full right, power and authority to operate and lease the Property.

9

EXHIBIT A
25

Section 3.2   **STATUS OF BORROWER.**   Borrower's exact legal name is correctly set forth on the first page of this Agreement, on the Security Instrument and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified on the first page of this Agreement. Borrower is incorporated in or organized under the laws of the state of .  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, has been for the preceding four months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Agreement. Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth on the first page of this Agreement

Section 3.3   **VALIDITY OF DOCUMENTS.**   (a) The execution, delivery and performance of the Loan Documents and the borrowing evidenced by the Note (i) are within the power of Borrower, (ii) have been authorized by all requisite action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected, (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby, and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority or other body (except for the recordation of the Security Instrument and any other Loan Document intended to be recorded in the appropriate land records in the State or Commonwealth where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby)

(b)   The Loan Documents constitute the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency or other similar laws affecting the rights of creditors generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 3.4   **LITIGATION.**   There is no material action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against, or affecting, Borrower, or any Guarantor, or against or affecting the Property.

Section 3 5   **STATUS OF PROPERTY.**   (a) No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in this Agreement.

(b)   Borrower has obtained all necessary certificates, licenses, permits and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

10

{F \wpdocs\9400\1054 00/00129657 DOC,}

(c)    The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use and environmental laws and other similar laws  None of the Improvements lies outside of the boundaries of the Land or the applicable building restriction lines.  No improvements on adjoining properties materially encroach upon the Property.

(d)    The Property is served by all utilities required for the current or contemplated use thereof.  All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.  The Property is served by public water and sewer systems

(e)    All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all applicable laws.

(f)    *All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public.*

(g)    The Property is free from damage caused by fire or other casualty.

(h)    The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects.  Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond

(i)    All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.  Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

Section 3.6    **SEPARATE TAX LOT.**  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof

Section 3 7    **NO FOREIGN PERSON**  Borrower is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

Section 3 8    **LEASES.**  (a) Borrower is the sole owner of the entire lessor's interest in the Leases, (b) the Leases are valid, enforceable and in full force and effect; (c) the

11

terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (d) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (e) none of the Rents have been collected for more than one (1) month in advance; (f) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (g) there exist no offsets or defenses to the payment of any portion of the Rents, (h) Borrower has received no notice from any tenant challenging the validity or enforceability of any Lease; (i) there are no agreements with the tenants under the Leases other than expressly set forth in each Lease; (j) no Lease contains an option to purchase, right of first refusal to purchase, or any other similar provision, (k) no Person has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (l) each Lease is or will be subordinate to the Security Instrument, either pursuant to its terms or a subordination agreement; (m) no brokerage commissions or finders fees are due and payable regarding any Lease; and (n) except as previously disclosed by Borrower to Lender in writing, no tenant under any of the Leases is an Affiliate of Borrower.

Section 3.9   **FINANCIAL CONDITION.**   Borrower (a) is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated, and (b) has received reasonably equivalent value for the granting of the Loan and the Security Instrument.

Section 3.10   ***BUSINESS PURPOSES***   The proceeds of the Loan will be used by Borrower solely for business purposes and not for personal, family, household or agricultural purposes. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by legal requirements or by the terms and conditions of the Loan Documents

Section 3.11   **TAXES.**   Borrower and any Guarantor have filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Neither Borrower nor any Guarantor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years

Section 3 12   **NO CHANGE IN FACTS OR CIRCUMSTANCES.**   All information in the application for the Loan submitted to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with such loan application or in satisfaction of the terms thereof, are accurate, complete and correct in all material respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise materially misleading.

Section 3 13   **DISCLOSURE**   Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading   Borrower has delivered to Lender a true, correct and complete rent roll for the Property (a "Rent Roll") which includes all Leases affecting the

12

EXHIBIT A
28

Property (including schedules for all executed Leases for Tenants not yet in occupancy or under which the rent commencement date has not occurred).

Section 3.14 **THIRD PARTY REPRESENTATIONS.** Each of the representations and the warranties made by each Guarantor herein or in any of the other Loan Documents is true and correct in all material respects

Borrower recognizes and acknowledges that in accepting the Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in this Article 3 without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Loan Documents; and that Lender would not be willing to make the Loan in the absence of the warranties and representations as set forth in this Article 3.

## Article 4. - INSURANCE, CASUALTY, CONDEMNATION AND PROCEEDS

Section 4 1   **INSURANCE**

(a)   Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)   Insurance against loss or damage by fire, casualty and other hazards as now are or subsequently may be covered by an "all risk" policy or a policy covering "special" causes of loss, with such endorsements as Lender may from time to time reasonably require including, without limitation, building ordinance and law covering the Improvements and Personal Property in an amount equal to one hundred percent (100%) of the full insurable replacement value of the Improvements and Personal Property (exclusive of footings and foundations below the lowest basement floor) without deduction for depreciation The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the insurer issuing the coverage or, at Lender's election, by reference to such indexes, appraisals or information as Lender determines in its reasonable discretion   Each policy shall, subject to Lender's approval, contain a replacement cost endorsement, without deduction for depreciation and either an agreed amount endorsement or a waiver of any co-insurance provisions, and shall provide for deductibles in such amounts as Lender may permit in its sole discretion

(ii)   Commercial general liability insurance under a policy containing "Comprehensive General Liability Form" of coverage (or a comparably worded form of coverage) and the "Broad Form CGL" endorsement (or a policy which otherwise incorporates the language of such endorsement), providing coverage on an occurrence (not "claims made") basis, which policy shall include, without limitation, coverage against claims for personal injury, bodily injury, death and property damage liability with respect to the Property and the operations related thereto, and the following coverages:  Employee as Additional Insured, Product

13

{F \wpdocs\9400\1054 00/00129657 DOC,}

Liability/Completed Operations, Independent Contractor, Personal Injury and hired and non-owned automobile coverage (including rented and leased vehicles), all of which shall be in such amounts as Lender may from time to time reasonably require, but not less than One Million Dollars ($1,000,000) per occurrence with a general aggregate limit of Two Million Dollars ($2,000,000)  If such policy shall cover more than one property, such limits shall apply on a "per location" basis.

      (iii)     Business income (including loss of rents) insurance covering losses for risks as specified in this Section in an amount equal to (i) one hundred percent (100%) of the actual business income (or Rents) for the preceding twelve (12) month period, (ii) the profits and estimated continuing expenses for the twelve (12) month period following a loss, or (iii) the "actual loss sustained" for the twelve (12) month period following a loss.  The amount and coverage of such business income insurance shall be determined once each calendar year thereafter based on Borrower's reasonable estimate of rental income or projected gross revenues from operations, as the case may be, from the Property for the succeeding twelve (12) months as approved by Lender  Such business income insurance shall include either an agreed amount endorsement or a waiver of any co-insurance provisions, so as to prevent Borrower, Lender and any other insured thereunder from being a co-insurer.

      (iv)     During the period of any new construction on the Land, a so-called "Builder's All-Risk Completed Value" insurance policy in non-reporting form for any improvements under construction, including, without limitation, for demolition and increased cost of construction or renovation, in an amount equal to one hundred percent (100%) of the estimated replacement cost value on the date of completion, including "soft cost" coverage, and Worker's Compensation Insurance covering all persons engaged in such construction, in an amount at least equal to the minimum required by law.  In addition, each contractor and subcontractor shall be required to provide Lender with a certificate of insurance for (i) Worker's Compensation Insurance covering all persons engaged by such contractor or subcontractor in such construction in an amount at least equal to the minimum required by law, and (ii) general liability insurance showing minimum limits of at least Five Million Dollars ($5,000,000), including coverage for products and completed operations.  Each contractor and subcontractor also shall cover Borrower and Lender as an additional insured under such liability policy and shall indemnify and hold Borrower and Lender harmless from and against any and all claims, damages, liabilities, costs and expenses arising out of, relating to or otherwise in connection with its performance of such construction.

      (v)     Insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery, elevators and escalators, if any, and other similar equipment installed in the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost of the Property, which policies shall insure against physical damage to and loss of occupancy and use of the Improvements arising out of an accident or breakdown covered thereunder.

14

EXHIBIT A
30

       (vi)    Flood insurance with a deductible not to exceed Five Thousand Dollars ($5,000), or such greater amount as may be satisfactory to Lender in its sole discretion, and in an amount equal to the full insurable value of the Property or the maximum amount available, whichever is less, if the Property is located in an area designated by the Secretary of Housing and Urban Development or the Federal Emergency Management Agency as having special flood hazards

       (vii)    Worker's compensation insurance or other similar insurance which may be required by governmental authorities or applicable legal requirements in an amount at least equal to the minimum required by law.

       (viii)    Such other insurance coverages, in such amounts, and such other forms and endorsements, as may from time to time be required by Lender and which are customarily required by institutional lenders to similar properties, similarly situated, including, without limitation, coverages against other insurable hazards (including, by way of example only, terrorism and acts of terrorism, earthquake, sinkhole and mine subsidence), which at the time are commonly insured against and generally available.

       (b)    All insurance policies required under this Section (each, a "Policy" and collectively, the "Policies") shall (i) have a term of not less than one year and (ii) be in the form and amount and with deductibles as, from time to time, shall be reasonably acceptable to Lender, under valid and enforceable policies. All insurance policies shall be issued by financially responsible insurers, either licensed to transact business in the State where the Property is located, or obtained through a duly authorized surplus line insurance agent or otherwise in conformity with the laws of such State, reasonably acceptable to Lender. Originals or certified copies of all Policies shall be delivered to and held by Lender.

       (c)    All Policies shall name Lender as an insured or additional insured, shall provide for loss payable to Lender and Borrower as their interests may appear (Borrower agreeing to turn over to Lender any proceeds that it might otherwise receive for application as set forth herein) and shall contain: (i) a standard "non-contributory mortgagee" endorsement or its equivalent and (ii) a provision that such policies shall not be canceled or amended, or failed to be renewed, without at least thirty (30) days prior written notice to Lender

       (d)    With respect to Policies which require payment of premiums annually, not less than ten (10) days prior to the expiration dates of such Policies, Borrower shall pay such amount, except to the extent Lender is reserving sums therefor pursuant to the Loan Documents. Not less than ten (10) days prior to the expiration dates of the Policies, originals or certified copies of renewals of such Policies (or binders evidencing such renewals) bearing notations evidencing the payment of all Insurance Premiums or accompanied by other evidence satisfactory to Lender of such payment shall be delivered by Borrower to Lender. The Insurance Premiums shall not be paid by Borrower through or by any financing arrangement unless otherwise approved by Lender  Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any insurance required under this Section.

15

{F \wpdocs\9400\1054 00/00129657 DOC,}

(e)     If Borrower fails to maintain and deliver to Lender the original Policies required by this Agreement, Lender may, at its option, procure such insurance and Borrower shall pay or, as the case may be, reimburse Lender for, all premiums thereon promptly, upon demand by Lender, with interest thereon at the Default Rate from the date paid by Lender to the date of repayment and such sum shall constitute a part of the Loan.

(f)     The insurance required may, at the option of Borrower, be effected by blanket and/or umbrella policies issued to Borrower or an Affiliate of Borrower covering the Property and the properties of such Affiliate, provided that, in each case, the policies otherwise comply with the provisions of this Agreement and allocate to the Property, from time to time, the coverage specified by this Agreement, without possibility of reduction or coinsurance by reason of, or damage to, any other property (real or personal) named therein. If the insurance required by this Agreement shall be effected by any such blanket or umbrella policies, Borrower shall furnish to Lender original policies or certified copies thereof, with schedules attached thereto showing the amount of the insurance provided under such policies which is applicable to the Property.

(g)     Neither Lender nor its agents or employees shall be liable for any loss or damage insured by the Policies; it being understood that (i) Borrower shall look solely to its insurance company for the recovery of such loss or damage, (ii) such insurance company shall have no rights of subrogation against Lender, its agents or employees, and (iii) Borrower shall use its best efforts to procure from such insurance company a waiver of subrogation rights against Lender. . If, however, any Policy does not provide for a waiver of subrogation rights against Lender (whether because such a waiver is unavailable or otherwise), then Borrower hereby agrees, to the extent permitted by law and to the extent not prohibited by such Policy, to waive its rights of recovery, if any, against Lender, its agents and employees, whether resulting from any damage to the Property, any liability claim in connection with the Property or otherwise. If any such Policy shall prohibit Borrower from waiving such claims, then Borrower must obtain from such insurance company a waiver of subrogation rights against Lender

Section 4 2     CONDEMNATION.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any Condemnation proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award but shall be entitled to receive out of the Award interest at the rate or rates provided or in the Note. Lender may apply any Award to the reduction or discharge of the Debt whether or not then due and payable or to the Restoration of the Property in its sole and absolute discretion. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

16

{F \w.pdocs\9400\1054 00/00129657 DOC;}

Section 4.3   **RESTORATION.**

(a)   In the event that the loss is less than or equal to One Hundred Thousand and 00/100 Dollars ($100,000.00), Lender shall apply the insurance proceeds actually received to restoration, provided no Event of Default shall have occurred and be continuing under any of the Loan Documents and Borrower promptly commences and is diligently pursuing restoration of the Property to nearly as possible the condition of the Property was in immediately prior to the Casualty (the "Restoration").

(b)   In the event that the loss exceeds One Hundred Thousand and 00/100 Dollars ($100,000.00), Lender shall make the Net Proceeds available to the Borrower for Restoration provided that each of the following conditions is satisfied:

(i)   no Event of Default shall have occurred and be continuing under any of the Loan Documents;

(ii)   the Net Proceeds shall not exceed the outstanding amount of the Debt;

(iii)   Lender shall determine that the Restoration can be completed prior to the earlier of (A) the date occurring twelve (12) months prior to the Maturity Date, or (B) the date occurring twelve (12) months after the date of the Casualty,

(iv)   Borrower shall commence the restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such damage or destruction occurs) and shall diligently pursue the same to satisfactory completion in a good and workmanlike manner;

(v)   Lender shall be satisfied in its sole discretion that any operating deficits which will be incurred with respect to the Property as a result of the occurrence of the Casualty, including a reasonable period thereafter for leasing the Property, will be covered out of (A) the Net Proceeds, (B) the rental or business income insurance coverage, or (C) other funds of Borrower,

(vi)   Lender shall be satisfied in its sole discretion that, upon the completion of the Restoration, the gross cash flow and the net cash flow of the Property, taking into consideration any Leases which may be terminated as a result of such Casualty, will be restored to a level sufficient to cover all carrying costs and operating expenses of the Property;

(vii)   the Restoration shall be performed and completed by Borrower in an expeditious and diligent fashion in a good and workmanlike manner in accordance with plans and specifications therefor approved by Lender (as provided in subsection (c) below) and in compliance with all Applicable Laws, and

(viii)   Borrower shall deliver to Lender evidence satisfactory to Lender (which may include certificates of governmental authorities, endorsements to

17

Lender's title insurance policy and/or legal opinions) that, following the completion of the Restoration, the Property and the use thereof will be in compliance with and permitted under all Applicable Laws.

(c)    The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section, shall constitute additional security for the Loan. Provided all of the conditions set forth in Subsection 4.3(b) have been and remain satisfied, then the following shall apply:

(i)    The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been (A) fully bonded and discharged of record or (B) fully insured, to the satisfaction of Lender

(ii)    All plans and specifications in connection with the Restoration shall be subject to prior review and approval in all respects by Lender and by the Restoration Consultant, which approval shall not be unreasonably withheld or delayed. Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Restoration Consultant's fees, shall be paid by Borrower.

(iii)    Until such time as the Restoration has been completed and Lender shall have received copies of any and all final certificates of occupancy or other certificates, licenses and permits required for the ownership, occupancy and operation of the Property in accordance with all Applicable Laws, Lender shall be entitled to retain, and not disburse, up to ten percent (10%) of the cost of the Restoration, as determined by the Restoration Consultant (the "<u>Restoration</u> .") Borrower hereby covenants diligently to seek to obtain any such certificates, licenses and permits    Promptly after the completion of the Restoration and delivery of such certificates, licenses and permits in accordance with the provisions hereof, provided no Event of Default shall then be continuing, Lender shall disburse the Restoration Retainage to or as directed by Borrower, subject, however, to Lender's right to apply any excess proceeds remaining after the completion of the Restoration to the payment of the Debt.

(iv)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Restoration Consultant to be incurred in

18

EXHIBIT A
34

connection with the completion of the Restoration, Borrower shall deposit the deficiency with Lender, which shall thereafter be treated as Net Proceeds, before any further disbursement of the Net Proceeds shall be made.

(v)     The excess, if any, of the Net Proceeds remaining after the Restoration Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 4.3, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper.

(d)     Notwithstanding any provision of this Agreement to the contrary, all Net Proceeds not required to be made available for the Restoration may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its sole discretion.

## Article 5. - BORROWER COVENANTS

Section 5.1     **PROPERTY USE**. The Property shall be used only as a residential property and for no other use without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

Section 5 2     **PAYMENT OF TAXES, ETC**. (a)     Except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Agreement, Borrower shall promptly pay all Taxes and Other Charges, and all charges for utility services provided to the Property at least five (5) days prior to the date upon which any fine, penalty, interest or cost for nonpayment is imposed, and furnish to Lender upon request receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Lender evidencing the payment thereof. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property.

(b)     If Borrower fails to pay all Taxes and Other Charges, Lender may, at its option, pay such Taxes and Other Charges, and Borrower shall pay or, as the case may be, reimburse Lender for, all amounts advanced for the payment of Taxes or Other Charges, promptly, upon demand by Lender, with interest thereon at the Default Rate from the date paid by Lender to the date of repayment and such sum shall constitute a part of the Debt and the Loan

(c)     After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes or Other Charges or any claims or judgments of mechanics, materialmen, suppliers or vendors or any lien therefor, provided that (i) no Event of Default has occurred and is continuing hereunder or under any of the other Loan Documents, (ii) Borrower is not prohibited from doing so under

19

{F \wpdocs\9400\1054 00/00129657 DOC,}

the provisions of any other agreement affecting either Borrower or the Property, (iii) such proceeding shall suspend the collection of the disputed amount from Borrower and from the Property (and Borrower shall furnish such security as may be required in the proceeding for such purpose), or Borrower shall have bonded over or paid all of the disputed amount under protest, (iv) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (v) Borrower shall have deposited with Lender adequate reserves for the payment of the disputed amount, together with all interest and penalties thereon, unless Borrower has bonded over or paid all of the disputed amount under protest.

Section 5.3   **LEASES AND RENTS.**   (a) Except as otherwise consented to by Lender, all Leases shall be written on the standard form of lease which shall have been approved by Lender.  Upon request, Borrower shall furnish Lender with executed copies of all Leases.  No material changes may be made to the Lender-approved standard lease without the prior written consent of Lender.  Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt, (ii) shall promptly send copies to Lender of all notices of default which Borrower shall send or receive thereunder; (iii) shall enforce all of the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents; and (vi) shall not consent to any assignment of or subletting under any Lease not in accordance with its terms, without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed.

(b)   All security deposits of lessees, whether held in cash or any other form, shall be treated by Borrower as trust funds, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at a federally insured institution reasonably satisfactory to Lender.

(c)   Borrower may enter into a proposed Lease (including the renewal or extension of an existing Lease (a "Renewal Lease")) without the prior written consent of Lender, provided such proposed Lease or Renewal Lease (i) provides for rental rates and terms comparable to existing local market rates and terms (taking into account the type and quality of the tenant) as of the date such Lease is executed by Borrower (unless, in the case of a Renewal Lease, the rent payable during such renewal, or a formula or other method to compute such rent, is provided for in the original Lease), (ii) is an arm's-length transaction with a bona fide, independent third party tenant, (iii) does not have a materially adverse effect on the value of the Property taken as a whole, (iv) is subject and subordinate to the Security Instrument and the Tenant thereunder agrees to attorn to Lender, (v) does not contain any option, offer, right of first refusal, or other similar right to acquire all or any portion of the Property, (vi) has a base term of less than fifteen (15) years including options to renew, (vii) has no rent, credits, free rents or concessions granted thereunder, and (viii) is written on the standard form of lease approved by Lender   All proposed Leases which do not satisfy the requirements set forth in this subsection shall be subject to the prior approval of Lender and its counsel, at Borrower's expense   Borrower shall promptly deliver to Lender copies of all Leases which are entered into pursuant to this subsection together with Borrower's certification that it has satisfied all of the conditions of this Section

20

EXHIBIT A
36

(d)   Borrower may, without the consent of Lender, amend, modify or waive the provisions of any Lease or terminate, reduce Rents under, accept a surrender of space under, or shorten the term of, any Lease (including any guaranty, letter of credit or other credit support with respect thereto) *provided* that such action (taking into account, in the case of a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a materially adverse effect on the value of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Agreement and any subordination agreement binding upon Lender with respect to such Lease. A termination of a Lease with a tenant who is in default beyond applicable notice and grace periods shall not be considered an action which has a materially adverse effect on the value of the Property taken as a whole. Any amendment, modification, waiver, termination, rent reduction, space surrender or term shortening which does not satisfy the requirements set forth in this subsection shall be subject to the prior approval of Lender and its counsel, at Borrower's expense. Borrower shall promptly deliver to Lender copies of amendments, modifications and waivers which are entered into pursuant to this subsection together with Borrower's certification that it has satisfied all of the conditions of this subsection.

(e)   Notwithstanding anything contained herein to the contrary, Borrower shall not, without the prior written consent of Lender, enter into, renew, extend, amend, modify, waive any provisions of, terminate, reduce Rents under, accept a surrender of space under, or shorten the term of any Major Lease.

Section 5.4   **MAINTENANCE OF PROPERTY.**   (a) Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not commit or suffer any waste of the Property or do or permit to be done thereon anything that may in any way impair the value of the Property. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender, which consent shall not be unreasonably withheld or delayed.

(b)   Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender.

Section 5 5   **COMPLIANCE WITH LAWS.**   Borrower shall promptly comply with all Legal Requirements. Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements

Borrower shall have the right, after prior written notice to Lender, to contest by appropriate legal proceedings diligently conducted in good faith, without cost or expense to Lender, the validity or application of any Legal Requirements and to suspend compliance therewith if permitted under Legal Requirements, provided (i) failure to comply therewith may not subject Borrower or Lender to any civil or criminal liability, (ii) prior to and during such

21

contest, Borrower shall furnish to Lender security reasonably satisfactory to Lender against loss or injury by reason of such contest or non-compliance with such Legal Requirements, (iii) no Event of Default shall exist during such proceedings, and such contest shall not otherwise violate any of the provisions of any of the Loan Documents, and (iv) such contest shall not subject the Property to any lien or encumbrance the enforcement of which is not suspended by such contest or otherwise affect the priority of the lien of the Security Instrument

Section 5 6   **BOOKS AND RECORDS**.   (a) Borrower and Guarantor, shall keep adequate books and records of account in accordance with GAAP or in accordance with other methods acceptable to Lender in its sole discretion, consistently applied and shall furnish to Lender the following, which shall be prepared, dated and certified by Borrower (or by Guarantor, to the extent such items relate to Guarantor) as true, correct and complete in the form required by Lender, unless otherwise specified below:

(i)      quarterly operating statements of the Property, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and major capital improvements for that quarter and containing appropriate year to date information, within thirty (30) days after the end of each fiscal quarter;

(ii)     an annual personal financial statement, within thirty (30) days after the close of each fiscal year of Borrower;

(iii)    an annual income tax returns, within ninety (90) days after the close of each fiscal year of Borrower and Guarantors, as the case may be; and

(iv)    such other financial statements, and such other information and reports as may, from time to time, be required by Lender.

(b)      Borrower and any Guarantor shall furnish Lender with such other additional financial or management information (including State and Federal tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender, including, without limitation, a property management report for the Property, showing the number of inquiries made and/or rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender, in reasonable detail and certified by Borrower as true, correct and complete

(c)      Following the occurrence of an Event of Default, or if Lender has reason to believe that any item furnished under this Section is materially inaccurate or misleading, Lender shall have the right, but not the obligation, to obtain any of the financial statements and other items required to be provided under this Section by means of an audit by an independent certified public accountant selected by Lender, in which event Borrower agrees to pay, or to reimburse Lender for, any expense of such audit and further agrees to provide all necessary information to said accountant and otherwise to cooperate in the performance of such audit.

Section 5.7   **MECHANICS' AND OTHER LIENS**   Subject to the provisions of Section 5 2(c), Borrower will promptly pay when due all bills and costs of all mechanics, materialmen, suppliers, vendors and others for labor, materials and other property incurred in

22

EXHIBIT A
38

connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien, charge, encumbrance or security interest, even though inferior to the liens and the security interests hereof. Subject to the provisions of Section 5.2(c), Borrower will discharge or promptly cause to be bonded or discharged by bonding (in the form of cash or a letter of credit), payment, final order of a court of competent jurisdiction or otherwise, any other or additional lien, charge, encumbrance or security interest in respect of the Property or any part thereof, except for the Permitted Exceptions

Section 5.8   **MANAGEMENT OF THE PROPERTY**.   The management of the Property shall be by either:  (a) Borrower or an Affiliate of Borrower approved by Lender for so long as Borrower or said Affiliate is managing the Property in a commercially reasonable manner satisfactory to Lender; or (b) a professional property management company approved by Lender, which approval shall not be unreasonably withheld. Such management by an Affiliate or a professional property management company shall be pursuant to a written agreement approved by and collaterally assigned to Lender, which shall provide that all rights of the manager thereunder shall be subject and subordinate to the lien of the Security Instrument and Lender's rights thereunder   In no event shall any manager be removed or replaced by Borrower or the terms of any management agreement modified or amended in any material respect or terminated by Borrower without the prior written consent of Lender   If an Event of Default shall occur, Lender shall have the right to terminate, or to direct Borrower to terminate, such management contract upon thirty (30) days' notice and to retain, or to direct Borrower to retain, a new bona-fide, independent third party management agent approved by Lender in its reasonable discretion to manage the Property.  Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of any management agreement on the part of Borrower to be performed and observed and (ii) promptly deliver to Lender a copy of any notice of default either given or received by Borrower under any such management agreement

Section 5 9   **PERFORMANCE OF OTHER AGREEMENTS**  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to Borrower or the Property, or given by Borrower to Lender for the purpose of further securing an Obligation and any amendments, modifications or changes thereto.

Section 5 10   **ACCESS TO PROPERTY**.  Borrower shall permit Lender, its agents and representatives to inspect the Property at reasonable hours upon reasonable advance notice a minimum of once per year

Section 5.11   **LITIGATION**  Borrower shall give prompt notice of any litigation or governmental proceeding pending or threatened against Borrower or Guarantor which might materially adversely affect Borrower's or Guarantor's condition, financial or otherwise, or the Property.

Section 5.12   **ALTERATIONS**.   Lender's prior approval shall be required in connection with any alterations to any Improvements, exclusive of alterations to tenant spaces required under any Lease, (a) that may have a material adverse effect on the Property, (b) that are structural in nature, or (c) that, together with any other alterations undertaken at the same time (including any related alterations, improvements or replacements), are reasonably anticipated to

23

EXHIBIT A
39

have a cost in excess of the Alteration Threshold. If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Lender, in its sole discretion, may require Borrower to establish a reserve for such amounts.

Section 5 13   **BANKING RELATIONSHIP**.   Borrower shall maintain an account with Lender.

Section 5.14   **COMPLIANCE WITH LENDER**.   With regard to the Loan, the undersigned parties agrees to cooperate fully with the Lender, including directing of any trust holding title to the subject property to execute, re-execute, correct and complete any and all documents evidencing, securing, or related to the above described loans in the event Bank should discover a mistake or error in any of the documents. Such correction, completions and re-executions shall be for the sole and limited purpose of conforming the Loan Documents to the terms and conditions set forth in the Lender's commitment letter and this Loan Agreement, and shall not add any new terms or conditions

## Article 6. - ENTITY COVENANTS

Section 6.1   **SINGLE PURPOSE ENTITY/SEPARATENESS**

Until the Debt has been paid in full, Borrower represents, warrants and covenants as follows.

(a)   Borrower has not and will not.

(i)   engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto,

(ii)   acquire or own any assets other than (A) the Property, and (B) such incidental Personal Property as may be necessary for the operation of the Property;

(iii)   merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(iv)   fail to observe all applicable organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents;

(v)   own any subsidiary, or make any investment in, any Person,

(vi)   commingle its assets with the assets of any other Person,

24

(vii)   incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date, and/or (C) financing leases and purchase money indebtedness incurred in the ordinary course of business relating to Personal Property on commercially reasonable terms and conditions; provided however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time three percent (3%) of the outstanding principal amount of the Note;

(viii)   fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person; except that Borrower's financial position, assets, liabilities, net worth and operating results may be included in the consolidated financial statements of an Affiliate, provided that such consolidated financial statements contain a footnote indicating that Borrower is a separate legal entity and that it maintains separate books and records;

(ix)   enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower, or any Affiliate of the foregoing, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(x)   maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xi)   assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person,

(xii)   make any loans or advances to any Person;

(xiii)   fail to file its own tax returns or files a consolidated federal income tax return with any Person (unless prohibited or required, as the case may be, by applicable Legal Requirements);

(xiv)   fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

{F \wpdocs\9400\1054 00/00129657 DOC,}

(xv)  fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(xvi)  fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses or to use separate stationery, invoices and checks;

(xvii)  fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds;

(xviii)  acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable;

Section 6.2    CHANGE OF NAME, IDENTITY OR STRUCTURE

Borrower shall not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including its trade name or names), (c) Borrower's principal place of business set forth on the first page of this Agreement, (d) the corporate, partnership, limited liability company or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational identification number, without in each case notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender.   Borrower authorizes Lender to file any financing statement or financing statement amendment required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.   At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.  If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Lender of such organizational identification number or change

Section 6.3    BUSINESS AND OPERATIONS

Borrower will qualify to do business and will remain in good standing under the laws of the State as and to the extent the same are required for the ownership, maintenance, management and operation of the Property

## Article 7. - TRANSFERS

Section 7.1    TRANSFERS BY BORROWER

Except with the prior written consent of Lender, Borrower agrees that Borrower shall not Transfer the Property or any part thereof or permit the Property or any part thereof to be Transferred.

26

{F.\wpdocs\9400\1054 00/00129657 DOC.}

Section 7.2   PERMITTED TRANSFERS.  Notwithstanding any other provision of this Section to the contrary, the following transfers shall be permitted without the Lender's consent:  (a) transfers of partnership interests, membership interests or corporate shares in Borrower or any entity holding an interest in Borrower between or among partners, members or shareholders existing as such on the date hereof, (b) transfers of partnership interests, membership interests or shares in Borrower to immediate family members of existing partners, members or shareholders or to trusts for estate planning purposes for the benefit of existing partners, members or shareholders or members of the transferor's immediate family; or (c) the sale or transfer in one or a series of transactions of not more than forty-nine percent (49%) of the shares, limited partnership interests (but not of the general partner) or non-managing membership interests of Borrower.  Borrower shall give Lender ten (10) days' prior written notice of any permitted transfer

## Article 8. - RESERVE FUNDS

Section 8.1   TAX RESERVE FUND.  Lender reserves the right to establish an account sufficient to discharge Borrower's obligations for the payment of Real Estate Taxes

Section 8.2   INSURANCE PREMIUM RESERVE   Lender reserves the right to establish an account sufficient to discharge Borrower's obligations for the payment of Insurance Premiums.

Section 8.3   REPLACEMENTS.  [Intentionally omitted.]

Section 8.4   RESERVE FUNDS GENERALLY

(a)   No earnings or interest on the Reserve Funds shall be payable to Borrower.

(b)   Borrower grants to Lender a first-priority perfected security interest in, and assigns and pledges to Lender, any and all Reserve Funds as additional security for payment of the Debt.   Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Debt.  The provisions of this Section are intended to give Lender or any subsequent holder of the Loan "control" of the Reserve Accounts within the meaning of the UCC.

(c)   Any and all Reserve Funds shall be subject to the exclusive dominion and control of Lender, which shall hold any or all Reserve Funds subject to the terms and conditions of this Agreement   Borrower shall have no right of withdrawal from the Reserve Funds except as expressly provided in this Agreement.

(d)   Lender shall furnish or cause to be furnished to Borrower, without charge, an annual accounting of each Reserve Account in the normal format of Lender or its loan servicer, showing credits and debits to such Reserve Account and the purpose for which each debit to each Reserve Account was made.

(e)   If any Event of Default occurs, Borrower shall immediately lose all of its rights to receive disbursements until the earlier to occur of (i) the date on which such Event of

27

Default is cured to Lender's satisfaction, or (ii) the payment in full of the Debt. Upon the occurrence of any Event of Default, Lender may exercise any or all of its rights and remedies as a secured party, pledgee and lienholder with respect to the Reserve Accounts. Without limitation of the foregoing, upon any Event of Default, Lender may use and disburse the Reserve Funds (or any portion thereof) for any of the following purposes: (A) repayment of the Debt, including, but not limited to, principal prepayments and the prepayment premium applicable to such full or partial prepayment (as applicable); (B) reimbursement of Lender for all losses, fees, costs and expenses (including, without limitation, reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default; (C) payment of any amount expended in exercising any or all rights and remedies available to Lender at law or in equity or under this Agreement or under any of the other Loan Documents; (D) payment of any item from any of the Reserve Accounts as required or permitted under this Agreement; or (E) any other purpose permitted by applicable law; provided, however, that any such application of funds shall
any Event of Default. Without limiting any other provisions hereof, each of the remedial actions described in the immediately preceding sentence shall be deemed to be a commercially reasonable exercise of Lender's rights and remedies as a secured party with respect to the Reserve Funds and shall not in any event be deemed to constitute a setoff or a foreclosure of a statutory banker's lien. Nothing in this Agreement shall obligate Lender to apply all or any portion of the Reserve Funds to effect a cure of any Event of Default, or to pay the Debt, or in any specific order of priority. The exercise of any or all of Lender's rights and remedies under this Agreement or under any of the other Loan Documents shall not in any way prejudice or affect Lender's right to initiate and complete a foreclosure under the Security Instrument

       (f)     The Reserve Funds shall not constitute escrow or trust funds and may be commingled with other monies held by Lender

## Article 9. - DEFAULTS; REMEDIES

       Section 9.1    **DEFAULTS.** The occurrence of one or more of the following events shall be an event of default ("Event of Default"):

       (a)     If any portion of the Debt is not paid when due,

       (b)     If any other Obligation is not performed in accordance with the terms and conditions of this Agreement and the other Loan Documents;

       (c)     If any of the Taxes or Other Charges is not paid at least five (5) days prior to the date upon which any fine, penalty, interest or cost for nonpayment is imposed, except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Agreement;

       (d)     If the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender upon request,

       (e)     If the Property is subject to actual waste or hazardous nuisance,

       (f)     The occurrence of a transfer prohibited by Article 7 of this Agreement,

28

(g)     If Borrower breaches any covenant with respect to itself contained in Article 6;

(h)     If any representation or warranty contained herein or in any other Loan Document or if any of the information contained in any documentation provided to Lender by Borrower in conjunction with the Loan shall not be true and accurate in all material respects as of the date made;

(i)     If any one or more of Borrower or Guarantor: (i) shall file a voluntary petition in bankruptcy or for relief under the federal Bankruptcy Act or any similar state or federal law; (ii) shall file a pleading in any proceeding admitting insolvency, (iii) shall not have vacated within sixty (60) days after the filing against Borrower or Guarantor of any involuntary proceeding under the federal Bankruptcy Act or similar state or federal law; (iv) shall have a substantial part of any one or more of their assets attached, seized, subjected to a writ or distress warrant, or levied upon, unless such attachment, seizure, writ, warrant or levy is vacated within sixty (60) days; (v) shall make an assignment for the benefit of creditors or shall consent to the appointment of a receiver or trustee or liquidator of all or the major part of its property, or the Property; or (vi) shall not have vacated any order appointing a receiver, trustee or of any Borrower or Guarantor or all or a major part of any such person's property or the Property.

(j)     If a notice of lien, levy or assignment is filed or recorded with respect to the Property or with respect to all or any of the assets of Borrower by the United States any department, agency or instrumentality thereof or by any state, county, municipal or other governmental agency, or if any taxes or debts owing at any time or times hereafter to any one of them becomes a lien or encumbrances upon the Property or any other of Borrower's assets and any of the foregoing is not released, bonded or otherwise secured to Lender's reasonable satisfaction within sixty (60) days after the same becomes a lien or encumbrance;

(k)     If Borrower shall continue to be in default under any other term, covenant or condition of this Agreement not specified above, for thirty (30) days after notice to Borrower from Lender, provided however, if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within the thirty day (30) period and Borrower shall thereafter diligently and expeditiously proceed to cure for such additional time as is reasonably necessary but not to exceed sixty (60) days.

Section 9.2   **REMEDIES**.  (a) Upon the occurrence of an Event of Default, Lender, at its option and without affecting the lien created by any Security Instrument, or any other Loan Document or the priority of said lien or any other right of Lender hereunder, may declare, without further notice, all debt owing to Lender immediately due with interest thereon at the Default Rate, whether or not such Event of Default is thereafter remedied by Borrower and Lender may immediately proceed to foreclose the Security Instrument and to exercise any right provided by the Security Instrument, the Note, the other Loan Documents, or any right, power, privilege or remedy at law or equity or otherwise.

(b)     Any actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in

29

such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender

Section 9.3   **RIGHT TO CURE DEFAULTS**   Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Security Instrument or collect the Loan, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest at the Default Rate, shall constitute a portion of the Loan and be secured by the Security Instrument and the Other Security Documents and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from that the incurrence of such cost or expense by Lender to the date of payment to Lender.

Section 9.4   **ADDITIONAL ADMINISTRATIVE FEE.**   In addition to the Default Rate provided for in the Note, upon the failure of Borrower or any Guarantor to deliver any of the reports, statements or other items required to be delivered to Lender as provided in Section 5.6 upon their due dates, if any such failure shall continue for ten (10) days following notice thereof from Lender, Borrower shall pay to Lender together with the scheduled monthly payments of principal and interest on the Note, for each month or portion thereof that any such report, statement or other item remains undelivered, an administrative fee in the amount of Five Hundred Dollars ($500) multiplied by the number of such undelivered reports, statements or other items. Borrower agrees that such administrative fee is a fair and reasonable fee necessary to compensate Lender for its additional administrative costs under the circumstances, is not a penalty and is necessary to compensate Lender for increased costs and obligations which will be incurred by Lender to third parties in connection with the planned securitization of the Loan.

## Article 10. - ENVIRONMENTAL MATTERS

Section 10.1   **ENVIRONMENTAL   REPRESENTATIONS   AND   WARRANTIES**   Borrower represents and warrants, based upon a review of the written report(s) resulting from the environmental assessment(s) of the Property delivered to Lender (collectively, the "Environmental Report") and information that Borrower knows or reasonably should have known, that. (a) there are no Hazardous Substances or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with all applicable Environmental Laws and, if required, with permits issued pursuant thereto, and (ii) either fully disclosed to Lender in writing pursuant to Environmental Report or are used by Borrower or tenants of the Property in the ordinary course of their business, (b) there are no past, present or threatened Releases of Hazardous Substances in, on, under or from the Property except as described in the Environmental Report; (c) there is no threat of any Release of Hazardous Substances migrating to the Property except as described in the Environmental Report, (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Report, (e)

30

Borrower does not know of, and has not received, any written or oral notice or other communication from any Person relating to Hazardous Substances or Remediation thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to conditions in, on, under or from the Property that is known to Borrower and that is contained in Borrower's files and records, including, without limitation, any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

Section 10.2  **ENVIRONMENTAL COVENANTS.**  Borrower covenants and agrees that: (a) all uses and operations on or of the Property, whether by Borrower or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Releases of Hazardous Substances in, on, under or from the Property; (c) there shall be no Hazardous Substances in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and, if required, with permits issued pursuant thereto, and (ii) fully disclosed to Lender in writing or are used by Borrower or tenants of the Property in the ordinary course of their business; (d) Borrower shall keep the Property free and clear of all Environmental Liens, (e) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender if Lender has reason to suspect that a Release of a Hazardous Substance might have occurred (including, without limitation, sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (f) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) reasonably effectuate Remediation of any condition (including, without limitation, a Release of a Hazardous Substance) in, on, under or from the Property; (ii) comply with any Environmental Law; (iii) comply with any directive from any governmental authority; and (iv) take any other reasonable action necessary or appropriate for protection of human health or the environment; (g) Borrower shall not do or allow any tenant or other user of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), impairs or may impair the value of the Property, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement or easement applicable to the Property; and (h) Borrower immediately upon becoming aware of the same shall notify Lender in writing of (A) any presence or Releases or threatened Releases of Hazardous Substances in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien, (D) any required or proposed Remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including, without limitation, a governmental entity) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Article 10

31

{F \wpdocs\9400\1054 00/00129657 DOC,}

Section 10.3  **LENDER'S RIGHTS**.  Lender and any other Person designated by Lender, including, without limitation, any receiver, any representative of a governmental entity, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including, without limitation, conducting any environmental assessment.. or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air or building materials, and conducting other invasive testing.  Borrower shall cooperate with and provide access to Lender and any such Person designated by Lender.

Section 10.4  **RELEASE**.  At Lender's election, from time to time, Borrower shall accept a release from the lien of the Security Instrument of any portion of the Property with respect to which Lender believes in good faith Hazardous Substances have been discovered on, at, in, under, or above and have or are or reasonably likely to have a material adverse effect on the Property, Borrower, Lender or the lien or priority of this Security Instrument, or with respect to which Lender believes in good faith an Environmental Law has been or may have been violated which has or is reasonably likely to have a material adverse effect on the Property, Borrower, Lender or the lien or priority of this Security Instrument  Borrower shall, at Borrower's expense, cause any consents, agreements and instruments to be entered into that may be reasonably required by Lender in connection with such release, including, without limitation, subdivision consents, appropriate surveys, appraisals of the subdivisions, consents of tenants, access agreements, easement agreements, consents of parties to existing agreements and consents of subordinate lienors  Borrower shall pay for any new title insurance policy or endorsement required by Lender in connection with any such release.

Section 10.5  **ENVIRONMENTAL INDEMNIFICATION**.  (a) Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Indemnified Persons from and against any and all Losses and costs of Remediation (whether or not performed voluntarily), engineers' fees, environmental consultants' fees, and costs of investigation (including, without limitation, sampling, testing, and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas) imposed upon or incurred by or asserted against any Indemnified Persons and directly or indirectly arising out of or in any way relating to any one or more of the following: (i) any presence of any Hazardous Substances in, on, above, or under the Property; (ii) any past, present or threatened Release of Hazardous Substances in, on, above, under or from the Property; (iii) any activity by Borrower, any Affiliate of Borrower or any tenant or other user of the Property in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, under, on or above the Property, (iv) any activity by Borrower, any Affiliate of Borrower or any tenant or other user of the Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including, without limitation, any removal, remedial or corrective action, (v) any past, present or threatened non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including, without limitation, any failure by Borrower, any Affiliate of

32

{F \wpdocs\9400\1054 00/00129657 DOC,}

Borrower or any tenant or other user of the Property to comply with any order of any governmental authority in connection with any Environmental Laws; (vi) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (vii) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Article; (viii) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Property, including, without limitation, costs to investigate and assess such injury, destruction or loss, (ix) any acts of Borrower or other users of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances at any facility or incineration vessel containing such or similar Hazardous Substances; (x) any acts of Borrower or other users of the Property, in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (xi) any personal injury, wrongful death, or property or other damage arising under any statutory or common law or tort law theory, including, without limitation, damages assessed for a private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Property; and (xii) any material misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to Article 10.

(b)     Notwithstanding the provisions of Section 10.5(a) or of any Loan Document to the contrary, Borrower shall have no obligation to indemnify the Indemnified Persons for Losses and costs of Remediation (i) in connection with Hazardous Substances which are initially released or placed on, in or under the Property after the date, if any, upon which Lender (or its designee) takes title to the Property following the occurrence of an Event of Default, or (ii) which result directly and solely from Lender's willful misconduct or gross negligence.

### Article 11. - INDEMNITY

Section 11.1  **INDEMNITY**.  Borrower hereby indemnifies the Indemnified Persons against, and agrees to hold each such Indemnified Person harmless from, any and all losses, claims, damages and liabilities, including claims brought by Borrower, any member, manager agent, representative or employee of Borrower, any Guarantor, or any other Person, and expenses relating to such claims, including reasonable counsel fees and expenses, incurred by such Indemnified Person arising out of any claim, litigation, investigation or proceeding (whether or not such Indemnified Person is a party thereto) relating to any transactions, services or matters that are the subject of this Agreement or the other Loan Documents; provided, however, that such indemnity shall not apply to any such losses, claims, damages, or liabilities or related expenses determined by a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of such Indemnified Person.  The agreements of Borrower in this Section shall be in addition to any liability that Borrower may otherwise have.  All amounts due under this Section shall be payable as incurred upon written demand therefor

33

EXHIBIT A
49

**Article 12. - WAIVERS**

Section 12.1   MARSHALLING AND OTHER MATTERS.   Borrower hereby waives, to the fullest extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all persons to the extent permitted by applicable law.

Section 12.2   WAIVER OF NOTICE.   Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by Applicable Law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 12.3   WAIVER OF STATUTE OF LIMITATIONS.   To the fullest extent permitted by law, Borrower hereby expressly waives and releases the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other Obligations

Section 12.4   MODIFICATION, WAIVER IN WRITING.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.   Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 12.5   DELAY NOT A WAIVER.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 12 6   WAIVER OF TRIAL BY JURY   BORROWER AND LENDER EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE

34

{F \wpdocs\9400\1054 00/00129657 DOC,}

EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDER AND BORROWER IS AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.

Section 12.7   WAIVER OF COUNTERCLAIM.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

### Article 13. - GENERAL PROVISIONS

Section 13.1   NOTICES.  Any notice, demand or other communication which any party hereto may desire or may be required to give to any other party under this Agreement or the other Loan Documents shall be in writing, and shall be deemed given (i) if and when personally delivered (effective upon delivery), (ii) upon receipt if sent by Federal Express or any other nationally recognized overnight courier (effective one (1) day after delivery to such courier), (iii) upon receipt if deposited in United States registered or certified mail, postage prepaid (effective three (3) days after mailing), or (iv) upon receipt if sent by facsimile (effective upon confirmation of transmission), in each case addressed as follows, or at such other place as such party may have designated to all other parties by notice in writing in accordance with this Section:

(a)   If to Borrower:

Sam Parabia and Perin Parabia
7213 Romero Drive
La Jolla, California 92037

with a copy to

Attention·
Facsimile No.: _____

(b)   If to Lender

The National Republic Bank of Chicago
1201 West Harrison Street
Chicago, Illinois 60607
Attention: Edward Fitzgerald
Facsimile No.:  312/738-4929

with a copy to·

Wohn, Kelter & Rosen, Ltd
55 West Monroe Street, Suite 3600
Chicago, Illinois 60603
Attention: Julie L  Kaminski
Facsimile No.:  312/424-0660

35

{F \wpdocs\9400\1054 00/00129657 DOC,}

(c)    If to Trustee:    David Bark
1620 Union Street
San Diego, California 92101

Except as otherwise specifically required herein, notice of the exercise of any right or option granted to Lender by this Agreement is not required to be given. Failure to deliver copies of notice shall not render the notice invalid.

Section 13.2 **EXPENSES**. Borrower shall be liable for payment of all reasonable costs incurred by Lender in connection with making the Loan, the preparation, execution and delivery of this Agreement and the other Loan Documents, the enforcement of the Loan Documents and Lender's rights and remedies thereunder, including, without limitation, reasonable attorneys' fees and costs, and consultants' fees and costs, recording fees, title insurance premiums, environmental assessment fees and appraisal fees.

Section 13.3 **APPRAISAL.** As long as the principal balance of the Debt shall exceed $500,000.00, Lender will require that the appraisal be updated or that a new MAI appraisal be prepared for all or any portion of the Property every two (2) years during the term of the Loan and Borrower shall be liable for the cost and expense of any such appraisals and shall cooperate with Lender in obtaining such appraisals. Any new appraisal of the Property shall be prepared by an appraiser designated by Lender in its sole discretion

Section 13.4 **ENTIRE AGREEMENT, AMENDMENTS AND WAIVERS**. This Agreement and the other Loan Documents contain the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and the same may not be amended, modified or discharged, nor may any of their terms be waived, except by an instrument in writing signed by the party to be bound thereby.

Section 13 5 **FURTHER ASSURANCES**. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, deeds of trust, mortgages, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording the Security Instrument, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 13 5.

36

{F \wpdocs\9400\1054 00/00129657 DOC,}

EXHIBIT A
52

Section 13.6   **NO THIRD PARTY BENEFITS**   This Agreement is for the sole and exclusive benefit of the parties hereto and their respective permitted successors and assigns, and no third party is intended to or shall have any rights hereunder.

Section 13.7   **ASSIGNS**.   The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

Section 13.8   **COUNTERPARTS**.   This Agreement and any document or instrument executed pursuant thereto may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 13.9   **GOVERNING LAW**.   This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, in which the transactions contemplated herein were negotiated, the Note and other Loan Documents were executed and delivered, and where the principal offices of Lender are located.

Section 13.10   **TIME OF THE ESSENCE**.   Time is of the essence of this Agreement.

Section 13.11   **SEVERABILITY**.   If any provision of this Agreement shall be judicially or administratively held invalid or unenforceable for any reason, such holding shall not be deemed to affect, alter, modify or impair in any way any other provision hereof.

**Section 13.12 JURISDICTION AND VENUE.   BORROWER AND ANY GUARANTOR HEREBY AGREE THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY BORROWER OR ANY GUARANTOR AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS, OR, THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION.   BORROWER AND ANY GUARANTOR HEREBY EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVE PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED HEREIN, AND AGREE THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AND ANY GUARANTOR AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT. BORROWER AND ANY GUARANTOR WAIVE ANY CLAIM THAT THE CIRCUIT COURT FOR COOK COUNTY, ILLINOIS, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE.   SHOULD BORROWER OR ANY GUARANTOR, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE**

37

EXHIBIT A
53

MAILING THEREOF, BORROWER AND ANY GUARANTOR SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER AND/OR ANY GUARANTOR AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR BORROWER SET FORTH IN THIS PARAGRAPH SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT, BY LENDER, OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING, BY LENDER, OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, BORROWER HEREBY WAIVE THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

Section 13 13 **ACKNOWLEDGMENTS**. Borrower hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     neither Lender nor anyone associated with Lender has any fiduciary relationship with or fiduciary duty to Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Lender, and Borrower, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture or partnership is created hereby or by the other Loan Documents or otherwise exists by virtue of the transaction contemplated hereby among the parties

Section 13.14 **CONFLICTS**. In the event of any conflict between the terms of this Agreement and the terms of any of the other Loan Documents, the terms of this Agreement shall control.

**IN WITNESS WHEREOF**, Borrower and Lender have caused this Agreement to be duly signed and delivered as of the day and year first above written.

**BORROWER:**

SAM PARABIA

PERIN PARABIA

[Additional signature to follow]

38

EXHIBIT A
54

**LENDER:**

THE NATIONAL REPUBLIC BANK OF
CHICAGO, a national bank

By: _____
Name: Edward Fitzgerald
Its.    President

{F \wpdocs\9400\1054 00/00129657 DOC,}

EXHIBIT A